529 So.2d 1138 (1988)
Diane Dally TURNER, Appellant,
v.
Filo Harris TURNER, Jr., Appellee.
No. BT-153.
District Court of Appeal of Florida, First District.
April 20, 1988.
Charles J. Kahn, Jr. of Levin, Warfield, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, Pensacola, for appellant.
*1139 James D. Swearingen of Harrell, Wiltshire, Stone & Swearingen, Pensacola, for appellee.
JOANOS, Judge.
The wife appeals the final judgment of dissolution of marriage, raising three issues for our review: (1) the trial court's finding that the husband's assets were not subject to equitable distribution, (2) the trial court's failure to award lump sum alimony to the wife, and (3) the trial court's failure to provide findings of fact with regard to the denial of equitable distribution. We reverse and remand on point three, but find the other issues merit some discussion.
The parties were married December 27, 1958, when the wife was twenty-one and the husband was thirty-seven. It was the first marriage for both. Five children were born of the marriage, all of whom had attained majority at the time of the final hearing. On July 29, 1986, the wife filed a petition for dissolution, together with an affidavit stating that she was unable to fill out a financial affidavit because she had no knowledge of the financial situation of the parties.
The record reflects that after her graduation from high school, the wife worked briefly, first as a sales clerk, and then as a switchboard operator. During the parties' 28-year marriage, the wife did not work outside the home. It is undisputed that during the marriage the wife was not privy to knowledge of the husband's financial position. The husband provided grocery money to the wife on a weekly basis, but otherwise retained control of the family finances. The wife did not know the amount of the husband's income, the amount of the house payment, the amount of the utility bill, or any of the other details regarding the family's finances. Moreover, the wife was without charge account or check-writing privileges, so that, with the exception of groceries, the husband made virtually all purchases. In addition, there was testimony that the husband regularly signed the wife's name to the parties' joint tax returns, and held the wife's power of attorney.
The information concerning the husband's finances was provided by the husband and his brother. In 1957, the husband's family (his father, mother, brother, sister and the husband) formed 426 Corporation. The corporation was wholly owned, in equal shares, by the family members. The husband presently owns 20.23% of the corporation, and his ownership interest in 426 Corporation and its enterprises has remained substantially the same throughout the marriage.
At the time of the marriage, the husband was employed as parts and service manager for the automobile dealership owned by his father. The dealership was situated on property owned by 426 Corporation. In addition to the dealership property, the corporation owns property which is leased for use as a used car lot, a shopping center, 1200 acres of timberland originally held by Lazy B Ranch, and acreage in Alabama. In 1986, the entity known as Lazy B Ranch was dissolved and title to the tract of land is now held by 426 Corporation, the husband, the husband's brother, and one other individual.
In December 1986, 426 Corporation sold the automobile dealership property for $800,000. Although the evidence regarding value of all of these properties at date of acquisition is not entirely clear, it is undisputed that, without exception, the assets substantially increased in value during the marriage.
In addition to his 20.23% interest in his family-owned enterprises, the husband also formed an individually owned business known as White Sands Engineering Company. This company was primarily a consulting business, but the husband also used his company for speculation in various commodities. The husband said he had drawn an unspecified amount from White Sands Engineering in the past, but had taken only $400 from the company in the year preceding the hearing. In 1985 and 1986, the husband wrote a number of checks from his personal account to White Sands Engineering Company. The husband's tax returns reflected no income from White Sands. He explained that he wrote checks *1140 as large as $1,000 to White Sands to pay personal expenses, but acknowledged there was no real reason to pay personal expenses in this manner, rather than through his personal account.
According to the husband, his time during the marriage was primarily devoted to the family automobile business, from which he drew a monthly salary. The dealership was sold in 1977, and since that time the husband's income has been derived from 426 Corporation properties and now social security benefits. In addition to his work with the automobile dealership, the husband said he worked as a consultant, and worked on behalf of 426 Corporation as an analyst, maintenance supervisor, and supervisor of operations.
According to the husband and his brother, inflation is the major factor in the substantial increase in value of the assets acquired by 426 Corporation and Lazy B Ranch during the course of the parties' marriage. However, the brother agreed that factors other than inflation played some part in the enhanced value of these assets. The husband conceded that his most recent financial statement, prepared in 1981, reflected his net worth as $900,000. The husband explained the figure was inflated, as the statement had been prepared in connection with a loan. The husband also acknowledged that he had $17,000 in an A.G. Edwards brokerage account that had not been included on his financial affidavit. This $17,000 was the amount remaining of a $25,000 inheritance. In addition, the husband had two paid-up life insurance policies, but the cash surrender value was not clearly established. At the time of the final hearing, based on figures provided by the husband's brother, the husband's net worth was $424,000, exclusive of his interest in the marital home.
In contrast, the wife had no assets other than her interest in the marital home, no cash, and no demonstrated earning ability. At one point during the marriage, the wife's mother gave her $2,000, which she spent on clothes for herself and the children. In addition, the wife's mother gave her $1,700 with which to pay attorney's fees incurred in the dissolution. Although the wife's counsel advised that it might be necessary to obtain an accountant to clarify the complex nature of the husband's financial interests, there is no indication in the record that this step was taken.
In the final judgment, the trial court awarded the wife a 1986 Chevrolet Caprice, one-half of the sale price of the marital home, and $1,000 per month permanent alimony. The trial court found that with the exception of the marital home, all other property owned by the husband was not marital property subject to equitable distribution.
The final point raised by the wife concerns the trial court's failure to provide findings of fact with respect to the equitable distribution issue. This court has held that an appellate court may, when it is necessary in order to review a case, "require explicit findings with respect to disputed facts that form the factual basis on which a trial court undertakes to award equitable distribution." Barrs v. Barrs, 505 So.2d 602, 604 (Fla. 1st DCA 1987). See also Ashe v. Ashe, 509 So.2d 1146, 1148-1149 (Fla. 1st DCA 1987); DePoorter v. DePoorter, 509 So.2d 1141, 1146 (Fla. 1st DCA 1987). In a similar vein, the Fourth District has required findings where, as in the instant case, the trial court refused to provide equitable distribution. Danoff v. Danoff, 501 So.2d 1361 (Fla. 4th DCA 1987); Smith v. Smith, 487 So.2d 339 (Fla. 4th DCA), review denied, 496 So.2d 143 (Fla. 1986).
In this case, the trial court held summarily that with the exception of the marital home, all other property owned by the husband is not marital property subject to equitable distribution. Our examination of the record inclines us to a different view. We recognize that the trial court must be affirmed as to the facts if there is competent substantial evidence to support its findings. The record does reflect that for the most part, the husband's assets were acquired through inheritance or gift from his father or through the family corporation. However, there is what appears to be undisputed evidence that the enhanced *1141 value of the husband's assets can be attributed in some measure to the husband's efforts during the marriage. The record also reflects that on at least one occasion, the husband expended marital funds to acquire assets or to increase the value of an asset. The trial court's summary determination of the equitable distribution issue precludes meaningful review. We, therefore, reverse and remand. On remand the trial court is directed to reconsider the equitable distribution issue, taking such additional evidence as may be necessary, and to enter an order containing specific findings on this issue in sufficient detail to enable a reviewing court to understand what has been determined and why.
Equitable distribution is a mechanism developed by the Florida courts to achieve a fair division of marital assets acquired during the marriage. Marital assets are those assets which have been created by the parties' work efforts, services, or earnings. Pardue v. Pardue, 518 So.2d 954, 955 (Fla. 1st DCA 1988); Keller v. Keller, 521 So.2d 273, 276 (Fla. 5th DCA 1988); Szemborski v. Szemborski, 512 So.2d 987, 989 (Fla. 5th DCA 1987), review denied, 520 So.2d 586 (Fla. 1988); Wright v. Wright, 505 So.2d 699, 700 (Fla. 5th DCA 1987). Thus, an equitable distribution determination should recognize the enhanced value of assets owned solely by one spouse prior to the marriage, insofar as the increase in value can be attributed to marital labor or funds, inflation, or market conditions. The concept is not limited to a determination of the value of just those assets acquired during the marriage. See Carr v. Carr, 522 So.2d 880 (Fla. 1st DCA 1988); Crapps v. Crapps, 501 So.2d 661 (Fla. 1st DCA), review denied, 511 So.2d 297 (Fla. 1987); Sanders v. Sanders, 492 So.2d 705 (Fla. 1st DCA 1986).
In Crapps, this court held that the enhanced value of a spouse's separate property should be included as a marital asset in an equitable distribution scheme, to the extent that the increase in value could be attributed to the efforts of the spouse owning that property. The husband in Crapps worked in the family-owned bank, in addition to his work as a self-employed tree farmer. The land on which he grew pines had been given to him by his family prior to the marriage. During the marriage, the husband expended work efforts and marital funds on improvements to the property. This court found "the trial court erred as a matter of law in shielding from the equitable distribution plan the income from the pines and the assets purchased in the husband's name during the marriage with that income ... [and] the trial court erred in disregarding the dividends from the bank stock owned by the husband prior to the marriage or given to him by his family and the assets purchased during the marriage from the proceeds of those dividends." Accord Carr v. Carr, 522 So.2d at 885  "The trial court erred in failing to consider as marital assets the value of the tangible assets of the medical practice acquired subsequent to, and the enhancement in value of the assets during the marriage." See also Sanders v. Sanders, 492 So.2d at 708  value of farm property at the time of its inheritance by the husband properly shielded from equitable distribution, however, that exclusion did not extend as a matter of right to the full value of the homestead at the time of dissolution. We note that several other jurisdictions have determined that income derived from separate property during marriage constitutes marital property. Macdonald v. Macdonald, 532 A.2d 1046 (Me. 1987); Speer v. Speer, 18 Ark. App. 186, 712 S.W.2d 659 (1986); In re Marriage of Reed, 100 Ill. App.3d 873, 56 Ill.Dec. 202, 427 N.E.2d 282 (1981); Brunson v. Brunson, 569 S.W.2d 173 (Ky.App. 1978); In re Marriage of Williams, 639 S.W.2d 236 (Mo. App. 1982); Cain v. Cain, 536 S.W.2d 866 (Mo. App. 1976); In re Marriage of Arneson, 120 Wis.2d 236, 355 N.W.2d 16 (1984).
Carr, Crapps, and Sanders make clear that the enhanced value of separately owned assets becomes a marital asset when that enhanced value is due to marital labor or funds. Once the threshold requirement of marital labor or funds has been established, increases in value attributable to marital labor, funds, inflation, and market conditions will all apply.
*1142 In Wright, supra, the Fifth District discussed the Crapps and Sanders opinions, agreeing that any enhancement in value attributable to the efforts, earnings, or funds of either spouse during the marriage is subject to equitable distribution. In Wright, counsel for the respective parties stipulated that the increased value of the wife's separate one-half interest in property purchased with her sister prior to the marriage, was not attributable to the wife's earnings or labor. In light of that stipulation, the court held that the "passive appreciation of [the] asset due to inflation or fortuitous market forces ... [was] not a `marital asset' within the parameters of Canakaris." 505 So.2d at 700-701. Since the stipulation in Wright removed the possibility of marital labor or funds from consideration, the threshold for equitable distribution was not reached.
This case presents a fact scenario analogous to the fact patterns in Crapps and Sanders, rather than to the fact pattern in Wright. The husband in Crapps and Sanders owned property obtained from his respective family, either by inheritance or gift. In addition, the husband in Crapps was employed by the family-owned bank. In both cases, the evidence established unequivocally that the increased value of the husband's separate assets during the marriage was attributable in part to the husband's marital labor and earnings.
In the instant case, the husband urges strenuously that the increased value of his interest in 426 Corporation and other properties acquired in part with funds channeled through 426 Corporation, was a passive increase, as that concept was explained in Wright, and thus not subject to equitable distribution. Our examination of the record leads us to a different view. Although the husband testified that his work during the marriage had been primarily devoted to the family-owned automobile dealership, he also stated that he functioned as an analyst, operations supervisor, and maintenance supervisor for 426 Corporation and its holdings. In addition, the husband formed his own consulting business, White Sands Engineering Company. While no evidence was produced with respect to costs involved in organizing this company, the husband acknowledged he had received earnings from the company and had used the company for investment in commodities. Furthermore, the husband wrote personal checks in substantial amounts to White Sands Engineering Company during 1985 and 1986, even though he maintained the company was defunct. The evidence of other expenditures of marital funds made by the husband to acquire or increase the value of solely-owned assets is equally ambiguous. The husband's brother testified that when Lazy B Ranch was dissolved, he and the husband paid cash for the portion of the property placed in their individual names, as opposed to being titled in 426 Corporation. The evidence with respect to other assets reflected that acquisitions were made through 426 Corporation.
We recognize that the testimony concerning the Lazy B Ranch acquisition, following dissolution of that particular entity, is at odds with the wife's statement that the husband did not pay cash to acquire any assets during the marriage. However, it is undisputed that the wife was not informed with regard to the husband's financial dealings. Therefore, her testimony cannot be relied upon to support a finding that the husband expended no marital funds to acquire other assets or to increase the value of separately held assets.
Since the Sanders opinion was released shortly before entry of the final judgment in this case, the trial court may not have had the benefit of this court's analysis of the treatment to be accorded separate property in an equitable distribution scheme. Accordingly, on remand, the trial court is directed to apply the concept of equitable distribution as outlined in Crapps, Sanders, and Carr, or to provide findings to explain the reason why the Crapps, Sanders, and Carr rationale does not apply.
The second issue raised in this appeal concerns the lack of an award of lump sum alimony to the wife. It may be argued that lump sum alimony is normally not required if support needs can be met by permanent periodic alimony. Gelman v. Gelman, 512 So.2d 236 (Fla. 1st DCA 1987); McBride v. *1143 McBride, 424 So.2d 977 (Fla. 4th DCA 1983). However, "if the circumstances of the parties are such that permanent periodic alimony is unsuitable and the more affluent spouse has sufficient property to accommodate a lump sum award, the trial court is entitled to use that vehicle to meet the need even though acquisition of the property was not associated with the marriage." McBride, 424 So.2d at 979. Accord Gelman v. Gelman, supra; Gardner v. Gardner, 452 So.2d 981 (Fla. 5th DCA 1984). The standard for such an award of lump sum alimony in property not associated with the marriage is "a showing of a special reason or great need." McBride, 424 So.2d at 979.
In Rosen v. Rosen, 386 So.2d 1268 (Fla. 3d DCA 1980), review denied, 392 So.2d 1378 (Fla. 1981), the court found no cognizable justification to sustain a $125,000 lump sum alimony award. The husband was a young and healthy lawyer who admittedly limited his practice. The larger portion of his $60,000 annual income was derived from interest earned on inherited liquid assets of $500,000 to $600,000. The husband's age and health precluded the need to protect the wife and children from his possible early demise, or disability. In addition, it was clear that he would be able to make permanent periodic alimony payments. In a footnote, the court observed:
Of course, the husband's family derived assets must be taken into account in determining his ability to pay periodic, or, if otherwise appropriate, lump sum alimony. Firestone v. Firestone, 263 So.2d 223 (Fla. 1972).
386 So.2d at 1272, fn. 6.
The applicability of the Rosen rationale to the instant case is, of course, a matter left for the trial court's determination. However, if on remand, the trial court again determines that the husband's property is not subject to equitable distribution, lump sum alimony, paid periodically, could be an alternative mechanism to protect the wife from impecunity should the husband predecease her. Such an award would be particularly appropriate in this case, in light of the husband's claimed present shortage of liquid assets. The wife is now fifty years old, is without job skills, medical benefits, and retirement benefits. The husband is now sixty-eight years old, and is relatively affluent. In light of the long duration of the marriage and the dubious employability of the wife, on remand, the trial court should fashion an award that will afford a more equitable treatment for both parties.
Florida courts have held consistently that "the fact that one spouse played a more active role in the acquisition and enhancement of assets because that spouse was the primary wage earner, does not defeat the claim of the spouse who contributed to the family welfare in other ways." Crapps, 501 So.2d at 665; Sanders, 492 So.2d at 707; Brown v. Brown, 300 So.2d 719 (Fla. 1st DCA 1974), cert. dismissed, 307 So.2d 186 (Fla. 1975); Buttner v. Buttner, 484 So.2d 1265 (Fla. 4th DCA), review denied, 494 So.2d 1149 (Fla. 1986). In light of this principle, we find the trial court's provisions for the wife are not reasonable in the circumstances of this case. The evidence in the record before this court does not appear to support a finding that the husband expended no effort in the operation and management of the family enterprises, or that the husband expended no marital earnings in the acquisition of assets. Therefore, on remand the trial court should fashion an award which will more equitably reflect the wife's contributions to this 28-year marriage or make sufficient findings which can be supported by the evidence and the law to enable a contrary determination. Canakaris v. Canakaris, 382 So.2d 1197 (Fla. 1980); Pardue v. Pardue, 518 So.2d 954 (Fla. 1st DCA 1988). On remand, the trial court may take additional evidence, if necessary. Such an award should take into account the wife's needs, age, and limited employability. While we find no abuse of discretion in the award of permanent periodic alimony, the trial court's failure to make any other provision for the wife places her at risk of absolute poverty in the event the husband predeceases her.
Accordingly, the final judgment is reversed and remanded for further proceedings consistent with this opinion.
*1144 ERVIN, J., concurs.
BARFIELD, J., concurs with opinion.
BARFIELD, Judge, concurring:
I concur in reversing this case, but I do not wish to suggest a methodology to the trial judge in reviewing the case on remand. While it appears to me that thirty years of subterfuge and concealment have worked to the wife's disadvantage, the trial judge may be able to explain his conclusions by appropriate findings. It is the inability to give effective appellate review which causes me to join in reversal.
Appellate confusion and uncertainty is further exemplified in this case by our differing views of the record. For example, the 426 Corporation looks remarkably like a retirement fund which might necessitate Diffenderfer treatment. Diffenderfer v. Diffenderfer, 491 So.2d 265 (Fla. 1986). Security for the wife may be obtained through the use of existing insurance policies, if the concern is "to protect the wife from impecunity should the husband predecease her" as my colleagues mention in discussing lump sum alimony.
The majority opinion is a thoughtful analysis, albeit one with which I have expressed some disagreement in the past, but it is accomplished largely in the abstract. I think we should await findings from the trial judge upon which we can effect a meaningful review.